RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0084p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────────

UNITED STATES OF AMERICA,

                        *Plaintiff-Appellee*,

     *v.*

TYWAN MONTREASE SYKES,

                   *Defendant-Appellant.*

> No. 21-6067

────────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:18-cr-00178-1—Thomas A. Varlan, District Judge.

Argued: October 27, 2022

Decided and Filed: April 24, 2023

Before: McKEAGUE, WHITE, and MURPHY, Circuit Judges.

────────────────

## COUNSEL

**ARGUED:** Mark E. Brown, MENEFEE & BROWN, P.C., Knoxville, Tennessee, for Appellant. Luke A. McLaurin, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Mark E. Brown, MENEFEE & BROWN, P.C., Knoxville, Tennessee, for Appellant. Luke A. McLaurin, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

────────────────

## OPINION

────────────────

HELENE N. WHITE, Circuit Judge. Tywan Sykes was convicted of a series of offenses related to child pornography and enticement of a minor. On appeal, he argues that the district court erred in denying his motion to suppress evidence seized from his Facebook account and mobile phone; that the district court erroneously admitted evidence of a past sex-offense

conviction; that there was insufficient evidence to convict on all charges; and that his sentence is procedurally unreasonable.  We AFFIRM.

## I.

On October 10, 15, and 16, 2018, the National Center for Missing and Exploited Children (NCMEC) received "CyberTips"[1] from Facebook, indicating that crimes against a child were possibly being committed.  On October 16, 2018, the NCMEC forwarded the third CyberTip to the Knoxville Police Department (KPD).  This CyberTip reported that a 43-year-old male appeared to be using private messages on Facebook to entice a 15-year-old female to produce and send child-exploitation images and engage in sexual activity.  The CyberTip included excerpts from Facebook messages between a username "TySykes" and a minor named "M.D.," and suggested that the two may have already met to engage in sexual activity.  The CyberTip included the phone number and date of birth associated with the "TySykes" account, both of which matched information on record with the Blount County Sheriff's Office for Tywan Sykes.

After receiving the CyberTip, the KPD identified M.D., interviewed her, and examined her iPhone.  During the interview, M.D. stated that she and Sykes recently had sex and that she had sent nude photographs of herself to Sykes at his request.  On October 18, 2018, Investigator John Williams obtained an arrest warrant and Sykes was arrested by federal marshals.  Williams interviewed Sykes, seized his phone and placed the phone in a secure Faraday box.[2]  Sykes denied that he enticed M.D. or had sex with her, and claimed that an ex-girlfriend may have hacked his Facebook account.

A federal grand jury indicted Sykes on a charge of enticing a minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b).  The grand jury then returned a superseding indictment, charging Sykes with four counts: (1) knowingly enticing a minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct in

---

[1]A "CyberTip" is an alert submitted by an electronic service provider under 18 U.S.C. § 2258A indicating that the service provider believes that there has been a violation of federal statutes involving the production or distribution of child pornography.

[2]A Faraday box is a device that prevents any data from being sent from or received by a phone placed in the box.

violation of 18 U.S.C. § 2251; (2) knowingly attempting to entice a minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b); (3) committing felony offenses involving a minor while being required by Tennessee law to register as a sex offender in violation of 18 U.S.C. § 2260A; and (4) knowingly possessing child pornography in violation of 18 U.S.C. § 2252A.

Sykes filed two motions to suppress evidence retrieved from his Facebook account and cell phone. In his first motion, he argued that the NCMEC is a government entity and that Facebook had become an agent of the NCMEC by searching his account and then forwarding messages to the NCMEC. Accordingly, he argued, evidence seized as a result of Facebook's search was seized pursuant to government action without a warrant and should be suppressed. In his second motion, Sykes argued that evidence seized from his phone should also be suppressed because the month-and-a-half delay between the seizure of his cell phone on October 18, 2018, and the execution of the search warrant on November 29, 2018, was unreasonable. The district court denied both motions.

Sykes filed a motion in limine requesting the exclusion of any evidence of his prior sex offenses. Sykes was convicted of statutory rape in 1998 and aggravated statutory rape in 2012.[3] At the pretrial conference, the government agreed that it would not introduce evidence related to the 1998 conviction. The district court denied Sykes's motion in limine as to the 2012 conviction but stated that it would "caution the jury how to appropriately consider this evidence." R.120, PID 1135.

The government called seven witnesses at trial: Paul Grady, who ran the Blount County Sex Offender Registry; Kashira Henry, the victim of Sykes's 2012 aggravated statutory rape; Shannon Morris, a digital forensic analyst who worked in the Internet Crimes Against Children (ICAC) Task Force at the KPD; John Williams, the lead KPD investigator in the case; M.D., the victim; Darrin Deckard, M.D.'s father; and Deanna Rickerman, a patrol officer with the KPD.

Investigator Williams recounted how his team recovered emails from Sykes's cell phone. The government introduced two emails as exhibits: an email confirming the purchase of four

---

[3]Although Sykes was convicted of this offense in 2012, the underlying events occurred in 2008. For the sake of clarity, we primarily refer to this event as the "2012 conviction."

tickets to a Kevin Gates concert and an email confirming a hotel reservation for the same night, October 18, 2018.  Williams later testified that Sykes's internet history showed that he searched specifically for a hotel room with a hot tub.  The government also introduced printouts of text and Facebook messages and photographs exchanged between M.D. and Sykes.  Williams also testified about an apparent encounter between Sykes and M.D. on October 14, 2018.  At 12:52 a.m., based on GPS data from M.D.'s phone, M.D. exited the vicinity of her grandmother's house and went to "a church with a parking lot, a little bait shop beside it.  It's kind of out in a rural area, but it is fairly close."  R.122, PID 1294.  M.D. left the church at 1:36 a.m. and returned to her grandmother's house at 1:43 a.m.  Four minutes later, at 1:47 a.m., M.D. sent a text to Sykes's phone saying "Thanks for coming to see me, baby."  *Id.* at 1295.  Sykes responded "[y]ou don't have to thank me.  I would come to see you any time.  But go to the bathroom and clean up.  Okay?  Don't ask questions.  Just go to the bathroom and wash on the inside."  *Id.*  M.D. responded "Okay."  *Id.*  Sykes responded "No, go right now.  Okay?  Please.  Not later or tomorrow.  Go now."  *Id.*

Kashira Henry testified that in 2008 when she was 14-years old she had sex with Sykes after his persistent requests.  Following Henry's testimony about the 2008 incident, the district court instructed the jury:

> You have heard testimony that the defendant committed a sexual assault other than the one charged in the superseding indictment.  You may give that evidence such weight as you feel it deserves.  However, evidence of the prior sexual assault alone is not sufficient to prove the defendant guilty of the crimes charged in the superseding indictment.  Remember, the defendant is not on trial here for any act, conduct, or offense not charged in the superseding indictment.  The government must prove the crimes charged in the superseding indictment beyond a reasonable doubt.

R.121, PID 1185-86.

M.D. testified and denied her October 2018 statement to Williams that she and Sykes had had sex and that she had produced nude photographs for him at his request.  The government attempted to refresh M.D.'s recollection by showing her text messages and photos.  M.D. eventually admitted that she had sent photographs to Sykes.  When presented with text messages in which she and Sykes recounted sexual experiences together, M.D. testified that she did not

recall sending those text messages.  M.D. revealed on re-direct that the night before testifying, she went to the Blount County Sheriff's Office to visit Sykes via video and discuss her testimony.  M.D.'s father later testified that M.D. had "been very scared and very nervous" about testifying in the case.  R.122, PID 1323.

The government's final witness was KPD patrol officer Deanna Rickerman.  Rickerman read into evidence text and Facebook messages between Sykes and M.D.  In those exchanges, Sykes requested nude photographs from M.D. and directed her to pose in certain ways, and Sykes and M.D. discussed their past sexual experiences with each other.

At the close of the government's case in chief, Sykes moved to have all counts dismissed for failure to present sufficient evidence of guilt.  The district court denied the motion.  Sykes elected not to testify and did not call any witnesses.  The jury found Sykes guilty on all charges.  After trial, Sykes renewed his motion for judgment of acquittal under Rule 29 and moved in the alternative for a new trial under Rule 33.  These motions were also denied.

In advance of sentencing, the Probation Department filed its pre-sentence report (PSR) and recommended two-level sentencing enhancements for sex acts with a minor, unduly influencing a minor into sexual activity, and obstruction of justice.  The obstruction-of-justice enhancement was based on Sykes's behavior during M.D.'s video visit with him the night before her testimony.  The PSR reported that Sykes told M.D. that he had a dream that she came to court and pleaded the Fifth Amendment.  He also gave M.D. his attorney's number so that she could contact the attorney and find out what to say.  Although M.D. called Sykes's attorney, the attorney did not answer and M.D. left a message on his office voicemail.

The PSR recommended that the 35-year recidivist-offender enhancement be applied under 18 U.S.C. § 2251(e) based on Sykes having "2 or more prior convictions" "under the laws of any State relating to the sexual exploitation of children"—a statutory-rape conviction in 1998 and an aggravated-statutory-rape conviction in 2012.

The PSR calculated a Guidelines range for each of Sykes's convictions: Count 1, Mandatory 35 years to Life; Count 2, Mandatory 10 years to Life; Count 3, Mandatory 10 years in prison, imposed consecutively to any other counts; and Count 4, Maximum of 10 years.

The overall Guidelines range, based on a total offense level of 40 and a criminal-history category of VI, was 360 months to life. However, that range was increased to 45 years to life because of the mandatory terms required for Counts 1 and 3.

Sykes challenged the PSR's recommended sentence on four grounds: he was not subject to the recidivist-offender enhancement because his aggravated-statutory-rape and statutory-rape convictions in Tennessee do not qualify as predicate offenses; he was not subject to the obstruction-of-justice enhancement; the influence-of-a-minor enhancement did not apply; and the commission-of-a-sex-act enhancement did not apply. The district court rejected these objections. After reviewing the sentencing factors under 18 U.S.C. § 3553(a), the district court imposed a sentence of 45 years, to be followed by 30 years of supervised release. Sykes timely appealed.

## II. Motions to Suppress

When reviewing the denial of a suppression motion, we review the district court's factual findings for clear error, reviewing the evidence in the light most favorable to the government, and its conclusions of law de novo. *United States v. Cooper*, 893 F.3d 840, 843 (6th Cir. 2018). "A finding of fact is clearly erroneous when we are left with the definite and firm conviction that a mistake has been committed." *Id.*

### A. Facebook's Search of Sykes's Account

Sykes argues that the NCMEC is a governmental entity and that Facebook acted as an agent of the NCMEC (and therefore, as an agent of the government) when it searched his account. Sykes urges us to follow the Tenth Circuit's opinion in *United States v. Ackerman*, 831 F.3d 1292 (10th Cir. 2016) and hold that the NCMEC is a governmental entity. We confronted this same argument in *United States v. Miller*, 982 F.3d 412, 425-26 (6th Cir. 2020), and determined that "[w]e need not take a position on it." *Id*. at 426. We likewise see no need to resolve the issue here. The district court assumed, without deciding, that the NCMEC is a governmental entity but found nonetheless that Facebook's private search was not attributable to the government. Because we agree, we take the same approach.

For Facebook's private, warrantless search to be attributed to the government, Facebook must have acted as an agent of the government at the time of the search. In *Miller*, we explained that "the Supreme Court has stated that '[w]hat is fairly attributable [to the government] is a matter of normative judgment, and the criteria lack rigid simplicity.'" *Id.* at 422 (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)). As a result, the Court has "adopted a fact-bound approach to this attribution question" and deploys three "tests" to determine whether private action is attributable to the government. *Id.* Specifically, the Court has used a "'function' test that asks whether a private party performs a public function[,] . . . a 'compulsion' test that asks whether the government compelled a private party's actions[,] . . . [and] a 'nexus' test that asks whether a private party cooperated with the government." *Id.* (quoting *Romanski v. Detroit Ent. L.L.C.*, 428 F.3d 629, 636 (6th Cir. 2005)).

*Miller* controls our analysis here. There, we reviewed the three tests for agency and found that Google's use of hash-value matching software to find child pornography did not turn its private search into government action. We noted that the "function" test "covers only those limited activities—for example, running a city—that have 'traditionally *and* exclusively' been performed by the government," and found that Google's actions did not fall within that narrow category. *Id.* at 423 (quoting *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 341 (6th Cir. 2006)). For those same reasons, Facebook's search of Sykes's account does not constitute a "traditional and exclusive" government function, and Sykes does not satisfy the "function" test.

Nodding to the "compulsion" test, Sykes argues that 18 U.S.C. § 2258A places a duty on providers like Facebook to search for child pornography. Specifically, that statute states that electronic service providers "shall, as soon as reasonably possible after obtaining actual knowledge or any facts or circumstances" indicating an "apparent violation of" child-pornography laws, provide to the "Cyber Tipline of NCMEC . . . a report of such facts or circumstances." 18 U.S.C. § 2258A(a). We rejected this same argument in *Miller* and agreed with other Circuits that "a 'reporting requirement, standing alone, does not transform [a service provider] into a government agent whenever it chooses to scan files sent on its network for child pornography.'" *Miller*, 982 F.3d at 424 (quoting *United States v. Ringland*, 966 F.3d 731, 736 (8th Cir. 2020)). Indeed, Section 2258A seems to explicitly foreclose this argument, as it

disclaims any duty on the part of service providers to "monitor any user, subscriber, or customer of that provider," "monitor the content of any communication of any [user, subscriber, or customer]," or "*affirmatively search, screen, or scan for* [offending content]." 18 U.S.C. § 2558A(f) (emphasis added). Accordingly, we stressed in *Miller* that the mandate "compels providers only to *report* child pornography that they know of; it does not compel them to *search* for child pornography of which they are unaware." 982 F.3d at 424. Sykes has not shown that Facebook was compelled to search his account for child pornography and, therefore, has not satisfied the "compulsion" test.

The final test is the "nexus" test, which asks: "What was the private party's intent in undertaking a search? And did the government acquiesce to the search?" *Id*. at 425. In *Miller*, we recognized that by searching for child pornography on its platform, Google "sought to rid its virtual spaces of criminal activity for the same reason that shopkeepers have sought to rid their physical spaces of criminal activity: to protect their businesses." *Id*. Further, Google "'cooperated' with law enforcement only by sending a report. Yet courts typically reject arguments that a private party's decision to call 911 or report a crime creates an 'agency' relationship." *Id*. We also rejected any argument that the government had "acquiesced" in Google's search because "[p]olice got involved only after Google had performed that scan and uncovered the crime." *Id*. The same is true here. Facebook produced a declaration from an employee that stated that Facebook had an independent business purpose for keeping its platform safe and free of child-exploitation content. Facebook's private actions to protect its platform are not attributable to the government. Accordingly, the district court did not err in denying Sykes's motion to suppress evidence retrieved from his Facebook account.

## B. The Delay between Seizure and Search of Sykes's Cell Phone

In his second motion to suppress, Sykes argued that the 42-day delay between the initial seizure of his cell phone and the execution of the search was unreasonable. It is well-settled that police may "seiz[e] an item based on probable cause in order to secure a search warrant for it." *United States v. Respress*, 9 F.3d 483, 486 (1993). However, a seizure that is "lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests." *United States v. Jacobsen*, 466 U.S. 109, 124

(1984).  Extended seizure without justification can give rise to a Fourth Amendment violation.  *See, e.g.*, *United States v. Place*, 462 U.S. 696, 709-10 (1983).  The reasonableness of such a delay requires balancing the individual's possessory interest in the object seized against the law-enforcement interests justifying the seizure and retention.  *Id*. at 703-05.

Sykes argues that *United States v. Pratt*, 915 F.3d 266 (4th Cir. 2019), supports reversal of the denial of his motion to suppress.  In *Pratt*, the defendant argued that the FBI's failure to obtain a warrant to search his phone for 31 days after seizing it rendered the search unreasonable.  The Fourth Circuit agreed.  The court found that "Pratt didn't diminish his possessory interest in the phone.  He didn't consent to its seizure or voluntarily share the phone's contents" and "[t]he government's only explanation for the 31-day delay in obtaining the warrant was that Pratt committed crimes in both North Carolina and South Carolina and agents had to decide where to seek the warrant."  *Id*. at 272.  The court found this explanation "insufficient," and distinguished Pratt's case from delays that had been held reasonable by other courts, noting that "the FBI's resources were not overwhelmed" and "[s]imply put, the agents here failed to exercise diligence by spending a whole month debating where to get a warrant."  *Id*.

*Pratt* is instructive.  There, the court stressed that the "government ha[d] no persuasive justification for the delay in obtaining a search warrant" and the "government's only explanation" for the delay was its indecision about where to file for the search warrant.  *Id.*  The critical finding in *Pratt* was that "the agents here failed to exercise diligence by spending a whole month debating where to get a warrant. . . . That decision shouldn't have taken a month.  It is unlikely that the forum for a warrant would affect a later prosecution: a point the government conceded at oral argument."  *Id*.

Here, Investigator Williams's testimony at the suppression hearing established that the delay between the seizure and search was not due to indecision or lack of diligence, but instead to the demands of this and other cases. Between October 18, 2018, when Investigator Williams seized Sykes's phone, and November 29, 2018, when he obtained the search warrant, he (1) prepared a preservation request for Sykes's cell phone provider; (2) prepared search warrant requests for Sykes's and M.D.'s Facebook accounts; (3) prepared a warrant for cell-tower information for Sykes's phone; (4) sent subpoenas to T-Mobile and Charter for subscriber

information; (5) obtained the Facebook warrants and engaged in the "very time-consuming" process of reviewing 3,400 pages of Facebook communications to identify whether Sykes had been grooming other victims, R.59, PID 275; (6) identified other potential victims from those messages; (7) testified before the federal grand jury in Sykes's case; (8) attended a two-day mandatory training for the ICAC task force in Gatlinburg; (9) assisted the Department of Homeland Security with a separate investigation, which required its own search warrant; (10) attended a Child Protective Team Hearing for the other potential victims; (11) executed the search warrant in the DHS investigation; (12) interviewed Sykes's ex-girlfriend about Sykes's allegation that she had hacked his Facebook account; (13) attended the Tennessee Department of Children Services' forensic interviews of the other potential victims; and (14) prepared and completed the search warrant for Sykes's phone. Williams worked diligently to pursue all avenues on this case during the 42-day delay, while working to protect other potential victims and attending to other important responsibilities.

Further, the balance between Sykes's possessory interest in the phone and the government's law-enforcement interests in maintaining custody over the phone weighs in the government's favor. There was probable cause to believe that the phone contained child pornography, as well as potential evidence of sex crimes against a minor. S*ee United States v. Laist*, 702 F.3d 608, 616 (11th Cir. 2012) (explaining that the government retained a "legitimate interest in maintaining custody of the computer and hard drives as substantial evidence of a serious federal crime"). By maintaining possession of the phone, the government was able to protect against the loss of important evidence. As the government notes, the phone was safely kept in a secure Faraday box, and "[j]ust as narcotics can be easily disposed of with the flush of a toilet, digital evidence can be wiped from a phone with the tap of a finger." Appellee Br. at 30; *see also Place*, 462 U.S. at 701-02 (noting that, under certain circumstances, "the risk of the item's disappearance or use for its intended purpose before a warrant may be obtained outweighs the interest in possession").

In contrast, Sykes's possessory interest in the phone was "virtually nonexistent." *Segura v. United States*, 468 U.S. 796, 813 (1984) (noting that where defendants were under arrest and in custody of the police throughout the entire time their apartment was occupied by the police,

their possessory interest "in the apartment and its contents was, thus, virtually nonexistent"). Williams testified at the suppression hearing that the Blount County Detention Facility is required by Tennessee law to retain possession of prisoners' cell phones inside the facility. He also testified that Sykes never requested that his phone be returned or turned over to someone else. *See United States v. Johns*, 469 U.S. 478, 487 (1985) (noting that a defendant who "never sought return of the property" cannot have "alleged, much less proved, that the delay in the search of the packages adversely affected legitimate interests protected by the Fourth Amendment"); *United States v. Stabile*, 633 F.3d 219, 235 (3d Cir. 2011) (noting that the defendant's failure to "ask for the return of his hard drives until . . . *eighteen months* after the initial seizure" "undermine[s] his argument" that he had strong possessory interests in his computer). Sykes argues that this makes "little sense" because, in effect, "if you have your property seized and you are in custody you must request the return of property that you aren't allowed to have in the first place." Appellant Br. at 33. But this is the point. Sykes had a limited possessory interest in the phone because he was not permitted to have the phone while he was in custody. In contrast, the government had a significant interest in retaining possession of the phone, as well as excusable reason for delay. Accordingly, the district court did not err in denying Sykes's motion to suppress the evidence retrieved from his phone.

### III. Prior Conviction Evidence

The admission of evidence under Federal Rule of Evidence 413 is reviewed under an abuse of discretion standard. *United States v. LaVictor*, 848 F.3d 428, 448-49 (6th Cir. 2017). Abuse of discretion occurs "when the reviewing court is firmly convinced that a mistake has been made. A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *Id.* at 449 (quoting *United States v. Allen*, 619 F.3d 518, 523-24 (6th Cir. 2010)).

Sykes concedes that Rule 413 "permits the introduction of any other sexual assault conviction on any matters to which such conviction is relevant" and thus, evidence of his prior statutory rape was admissible under Rule 413. Appellant Br. at 38. He argues, however, that the evidence should have been excluded under Rule 403, which allows for the exclusion of

admissible evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." *Id*. at 39.

The Rule 413 evidence here had substantial probative value. "'[A]dmissible bad acts evidence need not show incidents are identical to the events charged, so long as they are closely related to the offense' and 'are probative of intent.'" *United States v. Hruby*, 19 F.4th 963, 969 (6th Cir. 2021) (quoting *United States v. Lieu*, 963 F.3d 122, 129 (D.C. Cir. 2020)). And in the Rule 414(a) context—a sister rule of evidence enacted alongside Rules 413 and 415 that addresses similar crimes in the child-molestation context—this court has held that "if the charged conduct and the Rule 414(a) conduct are 'sufficiently similar,' the evidence satisfies Rule 403's balancing test." *Id*. (quoting *United States v. Underwood*, 859 F.3d 386, 393 (6th Cir. 2017)). That standard was satisfied here—testimony that Sykes had previously had sex with an underage girl rebutted his suggestion that his Facebook account had been hacked and that he was not the person sending messages to M.D.'s Facebook account. Moreover, in the 2012 conviction and here, Sykes targeted a teenage girl and pressed her for sexual acts that she did not initially want to engage in.

"Rule 413 evidence can be inherently prejudicial. By describing violent and sexual conduct, the evidence may have a strong propensity to evoke a visceral reaction from a lay jury." *LaVictor*, 848 F.3d at 450. Nevertheless, "Congress's decision to codify Rule 413 reflects its belief of the probative nature of such testimony." *Id*. That codification reflects "an understanding that sexual assault is different from regular prior bad acts." *Id*. Although inherently prejudicial, the evidence here was not unfairly so.

Additionally, the district court issued a limiting instruction to the jury, which addressed how they should consider the evidence of the 2012 statutory-rape conviction. That instruction further minimized any risk of unfair prejudice. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987) (noting that there is a presumption that juries follow their instructions). The district court did not abuse its discretion in admitting testimony of Sykes's prior statutory-rape conviction.

### IV. Sykes's Sufficiency of the Evidence and New Trial Motions

We review the sufficiency of evidence de novo. *United States v. Farrad*, 895 F.3d 859, 871 (6th Cir. 2018). "A conviction is supported by sufficient evidence if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Clark*, 24 F.4th 565, 571-72 (6th Cir. 2022) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "This limited review bars courts from intrud[ing] on the jury's role to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* (quoting *United States v. Maya*, 966 F.3d 493, 499 (6th Cir. 2020)).

Denial of a motion for new trial under Federal Rule of Civil Procedure 33 is reviewed under an abuse of discretion standard, which, "[u]nlike in a sufficiency claim," permits us to "consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice." *United States v. Hartman*, 213 F. App'x 396, 401 (6th Cir. 2007) (quoting *United States v. Solorio*, 337 F.3d 580, 589, n.6 (6th Cir. 2003)).

### A. Count I: Sexual Exploitation of a Minor for the Purpose of Producing Child Pornography

"[T]o violate § 2251(a), a defendant must sexually exploit a minor for the purpose of producing a visual depiction of this exploitation, and that same visual depiction must be produced using materials that have an interstate-commerce nexus." *United States v. Lively*, 852 F.3d 549, 561 (6th Cir. 2017) (emphasis omitted). Sykes raises three challenges to the sufficiency of the evidence supporting his § 2251(a) conviction: the government's proof of enticement was entirely circumstantial; M.D. denied sending any nude photos to him; and the government failed to provide sufficient evidence of a nexus to interstate commerce. These challenges are meritless.

To begin, the jury was presented with ample evidence—both circumstantial and direct—of Sykes enticing and directing M.D. to send him explicit photos. *See e.g.*, R.122, PID 1328 (Sykes to M.D.: "Ok but I want a pic with 2 fingers inside"; M.D. to Sykes: "I have nails."; Sykes to M.D.: "I'm sure you can handle it."); *id*. at 1329-30 (after M.D. sends a photo of her

buttocks, Sykes responds "Mmm I want to lick it. What bout the rest. You should have spreader (sic) it open so I can see in there. And I told you to stop shaving."); *id.* at 1331 (Sykes to M.D.: "I want fresh pics."); *id.* at 1332 (M.D. to Sykes: "U still want those pics love."; Sykes in response: "Yes."); *id.* at 1333 (Sykes to M.D.: "Still no pics."; M.D. in response: "Hold on and I'll take some. Im about to go get in the shower"; Sykes in response: "hey you could have sent them when you got out of the shower."); *id.* at 1335 (M.D. to Sykes: "Ok baby well ima take a shower."; Sykes in response: "Okay call me when you get out are you going to send me some pictures while you're in the shower all soaking wet even though you already wet wet.").

Sykes's argument that M.D. denied sending the photos is also without merit. The government introduced summary exhibits that included every text and Facebook message exchanged between Sykes and M.D. from September 6, 2018 through October 16, 2018. And Officer Rickerman read selected messages to the jury. Further, although M.D. was not especially forthcoming in her testimony, she ultimately admitted that she had sent photos to Sykes. Additionally, the jury had substantial reason to doubt M.D.'s denials in light of her video visit with Sykes the night before testifying.

Sykes also argues that the government failed to establish the required nexus to interstate commerce. Specifically, he argues "all the government did to prove the interstate commerce element was the testimony of Investigator Williams who simply opened the back of [M.D.'s] iPhone and Sykes['s] LG phone and testified that the phones are marked 'Made in China.'" Appellant Br. at 45. Our precedent requires nothing more. *See Lively*, 852 F.3d at 564 (holding that the government established the interstate commerce nexus by introducing a camera that was used to produce child pornography and its SanDisk memory card, which was stamped "Made in China").

## B. Count II: Enticement of a Minor to Engage in Sexual Activity

To sustain a conviction under 18 U.S.C. § 2422(b), the government must prove that the defendant "(1) 'use[d] the mail or any facility or means of interstate or foreign commerce'; (2) to 'knowingly persuade[], induce[], entice[], or coerce[],' or 'attempt[] to' persuade, induce, entice or coerce; (3) a person who the defendant believed to be under the age of eighteen; (4) 'to engage

in prostitution or any sexual activity for which a person can be charged with a criminal offense.'" *United State v. Vinton*, 946 F.3d 847, 852 (6th Cir. 2020) (quoting 18 U.S.C. § 2422(b)). Sykes argues that the "Government failed to meet its burden of proof on the substantive crime" and also "the attempt crime as he did not take a substantial step or commit an overt act toward the commission of the offenses." Appellant Br. at 47. Viewed in the light most favorable to the government, the evidence establishes otherwise.

Under § 2422(b) "[t]he crime is complete when the defendant both intends to persuade the minor child to assent to sexual activity and the defendant takes a substantial step toward completing the crime." *United States v. Roman*, 795 F.3d 511, 517 (6th Cir. 2015). Sykes argues that "there is certainly graphic talk both on a social media platform and messages. But that hardly counts as a substantial step toward the commission of the crime." Appellant Br. at 48. We disagree. Sykes sent multiple messages to M.D. asking to have sex with her and bought concert tickets and booked a hotel room with a hot tub for a planned sexual encounter with her. A rational juror could find that that buying concert tickets and reserving a hotel room—along with messages from Sykes to M.D. about how they would have sex together in the hotel room, even if M.D.'s friends were also in the room—constitutes a "substantial step." *See Roman*, 795 F.3d at 518 (describing "purchas[ing] flowers and the child's favorite Butterfinger candy to help 'break the ice' and to obtain her asset to engage in sexual activity with him" as a "substantial step[] toward completing the § 2422(b) offense").

There was also sufficient evidence to support the inference that Sykes and M.D. actually had sex together. On several occasions, M.D.'s messages to Sykes referred to the fact that they had had sex. *See, e.g.*, R.124-4, PID 1504 (Facebook message from M.D. to Sykes: "u said u aint had sex since we did at those apartments. so u had sex since the first time we did?"); *id*. at 1507 (Facebook message from M.D. to Sykes: "when did we start talking,? That night u picked me up from work and we had sex at your house for the first time"). And the government walked the jury through GPS data showing that M.D.'s phone travelled from her grandmother's home, spent 26 minutes in a church parking lot and returned to her grandmother's home. Then M.D. texted Sykes, "Thanks for coming to see me baby." R.122, PID 1295. Sykes responded, "You don't have to thank me" and instructed her to "go to the bathroom and clean up okay don't ask

questions just go to the bathroom and wash on the inside." *Id.* A rational juror could infer from that exchange that M.D. and Sykes had sex, and that Sykes wanted M.D. to clean herself so no one would find out.

### C. Count III: Committing a Felony Offense Involving a Minor as a Registered Sex Offender

A conviction under 18 U.S.C. § 2260A requires proof that the defendant (1) was "required by Federal or other law to register as a sex offender" and (2) "commit[ed] a felony offense involving a minor under" one of several federal statutes, including § 2251 (Count I) and § 2422 (Count II).[4] Sykes argues that his judgment of conviction in Tennessee did not require that he register as a sex offender, and that he registered "when directed only to avoid harsh penalties which are felonies under Tennessee state law." Appellant Br. at 48. A review of the record confirms that the requirement to register is not on the face of his judgment of conviction. However, the jury heard from Officer Paul Grady, the officer in charge of the Blount County Sex Offender Registry, that Sykes was required to register as a sex offender because of his "aggravated statutory rape . . . conviction in 2012." R. 121, PID 1165. Grady also testified that, although the requirement to register as a sex offender is typically "included in the judgment," he has "seen it where they're—it is not listed under the special conditions." *Id.* at 1173-74.

> Further, under Tennessee Code Section 40-39-212,
>
> [u]pon the court's acceptance of a defendant's entry of a plea of guilty or a finding of guilt by a jury or judge after trial, and, notwithstanding the absence of a final sentencing and entry of a judgment of conviction, any defendant who is employed or practices a vocation, establishes a primary or secondary residence or becomes a student in this state and who enters a plea of guilty to a sexual offense as defined by § 40-39-202 or a violent sexual offense as defined by § 40-39-202, shall be required to register with a registering agency.

Tenn Code Ann. § 40-39-212(a). And Section 40-39-202 of the Tennessee Code defines a "sexual offense" to include "[a]ggravated statutory rape, under § 39-13-506(c)." *Id.* § 40-39-

---

[4]Sykes also argues that the government failed to prove him guilty under Counts I or II, and that conviction under Count III fails for this reason as well. As discussed above, the government provided sufficient evidence to convict under Counts I and II.

202(20)(A)(xvi). Because Sykes was convicted in 2012 of aggravated statutory rape under § 39-13-506(c), he was required to register as a sex offender.

Thus, this conviction is adequately supported.

### D. Count IV: Possession of Child Pornography

A conviction under 18 U.S.C. § 2252A(a)(5)(B) requires proof that the defendant (1) "knowingly possesses, or knowingly accesses with intent to view, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography," (2) "that has been mailed, or shipped, or transported using any means or facility of interstate or foreign commerce or in affecting interstate or foreign commerce by any means . . . or that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer." On this count, Sykes's only challenge is that the government failed to produce sufficient evidence to prove the interstate-commerce element. As discussed above, the government presented proof that M.D.'s iPhone and Sykes's LG phone were both marked "Made in China." This is sufficient evidence of the required nexus to interstate commerce under our precedent. *Lively*, 852 F.3d at 564.

\*        \*        \*

As to Sykes's motion for a new trial under Rule 33, the evidence discussed above shows that the jury's guilty verdicts did not result in a miscarriage of justice.

### V.  Sykes's Challenges to His Sentence

Lastly, Sykes challenges his 45-year sentence. He argues that the district court erred in applying the statutory and Guidelines enhancements.[5]

---

[5]Sykes makes the generalized argument that his sentence was "both procedurally and substantively unreasonable," but he makes no specific argument nor provides any particularized explanation why his sentence was substantively unreasonable. We thus deem this subargument waived. *Cf. Cooper v. Com. Sav. Bank*, 591 F. App'x 508, 509 (6th Cir. 2015).

**A.  Recidivist Enhancements Under 18 U.S.C. § 2251(e)**

Under 18 U.S.C. § 2251(e):

> Any individual who violates, or attempts or conspires to violate, this section shall be fined under this title and imprisoned not less than 15 years nor more than 30 years, but if such person has one prior conviction under this chapter, section 1591, chapter 71, chapter 109A, or chapter 117, or under section 920 of title 10 (article 120 of the Uniform Code of Military Justice), or under the laws of any State relating to aggravated sexual abuse, sexual abuse, abusive sexual contact involving a minor or ward, or sex trafficking of children, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, such person shall be fined under this title and imprisoned for not less than 25 years nor more than 50 years, but if such person has 2 or more prior convictions under this chapter, chapter 71, chapter 109A, or chapter 117, or under section 920 of title 10 (article 120 of the Uniform Code of Military Justice), or under the laws of any State relating to the sexual exploitation of children, such person shall be fined under this title and imprisoned not less than 35 years nor more than life.

The district court found that Sykes's 2012 aggravated-statutory-rape and 1997 statutory-rape convictions were both qualifying "prior convictions" and applied the 35-year mandatory minimum enhancement.

Sykes argues that this was error because "at most only one of his prior Tennessee convictions was a predicate offense." Appellant Br. at 50. Sykes argues that under Tennessee law, child-exploitation crimes and statutory rape are codified at different places in the Tennessee Code. Because his prior offenses were for statutory rape and aggravated statutory rape, he argues that at least one (although it is not clear which offense) should not qualify as a predicate offense because the convictions are not convictions "relating to the sexual exploitation of children." We disagree.

To determine whether a prior state-law conviction can trigger federal sentencing consequences as a generic "predicate offense" we apply the categorical approach. Under that approach, the sentencing court "may 'look only to the statutory definitions'—i.e., the elements—of a defendant's prior offenses, and *not* 'to the particular facts underlying those convictions.'" *Descamps v. United States*, 570 U.S. 254, 260-61 (2013) (quoting *Taylor v. United States*, 495 U.S. 575, 600 (1990)). Once the elements of the prior crime have been identified, the court

compares the elements of that offense to the conduct enumerated in the generic federal offense—here, the conduct laid out in § 2251(e)—as they are "commonly understood." *United States v. Armes*, 953 F.3d 875, 879 (6th Cir. 2020). If the elements of the prior state offenses "relate to" the conduct laid out in § 2251(e), then those prior convictions can be used as sentence enhancements. *Id*.

Unlike some other predicate-offense enhancements in the United States Code, the sentencing enhancement described at § 2251(e) does not require a perfect match between the predicate offense and enhancement-qualifying conduct. Instead, § 2251(e) requires only that the prior offense "relat[e] to" the conduct described in the statute. In *United States v. Mateen*, 806 F.3d 857 (6th Cir. 2015), we agreed with our sister circuits that the phrase "relating to" triggers the sentencing enhancement for "any state offense that stands in some relation, bears upon, or is associated with that generic offense." *Id.* at 860 (collecting cases from the Ninth, Second, Eleventh, Fourth, and Eighth Circuits) (quoting *United States v. Sullivan*, 797 F.3d 623, 638 (9th Cir. 2015)). There, we reviewed the sentencing enhancement at 18 U.S.C. § 2252(b)(2), which provides for an enhanced sentence for defendants with a prior conviction "under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward, or the production . . . of child pornography." We explained that "when a sentence enhancement based on a state conviction requires the state statute to mirror the federal one, the enhancement statute is explicit. Section 2252(b)(2)'s 'relating to' language, however, requires only that the state statute be associated with sexual abuse." *Mateen*, 806 F.3d at 861.

We confronted a similar sentencing issue in *United States v. Sanchez*, 440 F. App'x 436 (6th Cir. 2011). There, Sanchez argued that his prior Illinois conviction of fondling the breasts of his 15-year-old co-worker while working in a fast-food restaurant did not constitute a state offense "relating to the sexual exploitation of children." *Id*. at 440. We rejected that argument, noting that

> Section 2251(e) ensures that a broad range of prior federal convictions will qualify—not merely other convictions [for child pornography] under § 2251, but also convictions for [sex trafficking of children] under '[chapter 110], [obscenity under] chapter 71, [various sexual abuse crimes under] chapter 109A, or [transportation for illegal sexual activity under] chapter 117, or [convictions for rape and sexual assault generally] under section 920 of title 10 (article 120 of the

Uniform Code of Military Justice).' It is implausible that Congress intended to include so many prior federal offenses but chose to restrict qualifying state offenses to child pornography production.

*Id.* The *Sanchez* court held that the district court properly determined that Sanchez's Illinois conviction "related to the 'sexual exploitation of children.'" *Id.* Other circuits have held similarly. *See e.g.*, *United States v. Mill*, 850 F.3d 693, 697-98 (4th Cir. 2017) (holding that "the statute sweeps broadly" and that "'sexual exploitation of children' means to take advantage of children for selfish and sexual purposes. Therefore, 'sexual exploitation' encompasses all the behaviors identified in § 2251(e)'s provision regarding a single prior conviction enhancement— that is, 'aggravated sexual abuse, sexual abuse, abusive sexual contact involving a minor or ward, or sex trafficking of children, [and] the production [or] possession . . . of child pornography' and then some."); *United States v. Smith*, 367 F.3d 748, 751 (8th Cir. 2004) (per curiam) (noting that "although the term 'sexual exploitation of children' is not defined in the statute, the term unambiguously refers to any criminal sexual conduct with a child).

In contrast, in *United States v. Schopp*, the Ninth Circuit determined that the term "'sexual exploitation of children' as contained in § 2251 is defined within that statute as the production of child pornography." 938 F.3d 1053, 1058 (9th Cir. 2019). The court first focused on the section's heading, "[s]exual exploitation of children," and determined that Congress named the section in order to "signal[] that the enumerated federal offenses in § 2251 constitute the federal understanding of the term 'sexual exploitation of children,' and that the term as subsequently used in § 2251(e) bears that same meaning." *Id.* at 1059-60. The court noted that, in light of the section's heading, "the enumerated elements of the offenses described in the statute constitute the definition of the offense bearing that name. All of the offenses described in § 2251 concern visual depictions of children engaging in sexually explicit conduct, with 'sexually explicit conduct' defined in a separate statute." *Id.* at 1060-61. Essentially, because § 2251 concerns crimes like "induc[ing] . . . any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct," and because § 2251 is titled "sexual exploitation of children," the Ninth Circuit reasoned that when Congress described enhanced penalties under § 2251(e) for individuals with two "or more prior convictions . . . under the laws of any State relating to the sexual exploitation of children,"

Congress must have meant the same underlying conduct. *Id.* at 1059-61 (quoting 18 U.S.C. § 2251(e)).

To reach this conclusion, the Ninth Circuit explained that in *Esquivel-Quintana v. Sessions*, 581 U.S. 385 (2017), the Supreme Court "concluded that '[s]ection 2243, which criminalizes "[s]exual abuse of a minor or ward," contains the only definition of that phrase in the United States Code'" and that "[l]ike § 2251, 18 U.S.C. § 2243 does not contain a definitional provision. Aside from two subsection headings which read '[sexual abuse] of a minor' and '[sexual abuse] of a ward,' the text contains no express reference to the term . . . . By concluding that § 2243 defines 'sexual abuse of a minor or ward,' the Court indicated that a section heading may serve as a basis for establishing what offense is being defined in the statutory text." *Schopp*, 938 F.3d at 1060.

Although *Esquivel-Quintana* does endorse the use of a section heading to establish what "offense is being defined in the statutory text," *id.*, it did so only after several crucial steps in its textual analysis. In *Esquivel-Quintana*, the Court was asked to define "sexual abuse of a minor" as used in the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(43)(A). 581 U.S. at 387. The Court began its interpretation by explaining that "[o]ur analysis begins with the language of the statute." *Id.* at 391. It then examined the term "sexual abuse" by reviewing dictionary definitions provided by the appellant and by the government. *Id.* at 391-92. After reviewing the dictionary definitions of "sexual abuse," the Court turned to "the structure of the [Immigration and Nationality Act]" to "guide our interpretation of sexual abuse of a minor." *Id.* at 393. The Court explained that because the "INA lists sexual abuse of a minor in the same subparagraph as 'murder' and 'rape,' . . . [t]he structure of the INA therefore suggests that sexual abuse of a minor encompasses only especially egregious felonies." *Id.* at 394. Only after considering the dictionary definitions of the term and the surrounding statutory structure did the Court turn to "[a] closely related federal statute, 18 U.S.C. § 2243 . . . which criminalizes '[s]exual abuse of a minor or ward.'" *Id.* Although the court relied on the conduct criminalized under Section 2243 as evidence of what "sexual abuse" could mean in the context of the INA, it expressly stated that the statute did not "provid[e] the complete or exclusive definition." *Id.* at 395.

We believe the Fourth and Eighth Circuits have the better argument and that Tennessee statutory rape is a conviction "relat[ed] to sexual exploitation of children." 18 U.S.C. § 2251(e). To start, the plain meaning of "sexual exploitation" is broad and covers "the use of a person, esp[ecially] a child, in prostitution, pornography, or other sexually manipulative activity." *Sexual Exploitation*, Black's Law Dictionary (11th ed. 2019). And turning to the structure of the statute, the enhanced penalties also apply to a laundry list of prior federal convictions, in addition to convictions "under the laws of any State relating to the sexual exploitation of children." 18 U.S.C. § 2251(e). Those eligible federal offenses include convictions "under this chapter [18 U.S.C. § 2251]," which criminalizes child pornography offenses; "chapter 71," which criminalizes the possession and sale of obscene materials, including child pornography; "chapter 109A," which criminalizes a variety of sexual abuse offenses, including sexual abuse of a minor; and "section 920 of title 10," which criminalizes rape and sexual assault in the military. *Id.* The "commonsense canon of *noscitur a sociis* . . . counsels that a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008). The broad list of federal offenses in such close proximity to convictions "under the laws of any State relating to the sexual exploitation of children" suggests a congressional intent to focus on a broad array of state sexual offenses against children, rather than only state child-pornography offenses.

Sykes points out that 18 U.S.C. § 2251(e) was amended in 2006. That amendment resulted in the current version of the statute, which added to the list of state offenses that trigger an enhanced penalty for defendants with one prior conviction. Specifically, the highlighted language was added:

> under this chapter, section 1591, chapter 71, chapter 109A, or chapter 117, or under section 920 of title 10 (article 120 of the Uniform Code of Military Justice), or under the laws of any State relating *to aggravated sexual abuse, sexual abuse, abusive sexual contact involving a minor or ward, or sex trafficking of children, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography*, such person shall be fined under this title and imprisoned for not less than 25 years nor more than 50 years.

18 U.S.C. § 2251(e) (emphasis added). However, the amendment failed to amend the parallel language for triggering an enhancement based on two or more prior convictions. "2 or more

prior convictions" will trigger enhanced penalties of "not less than 35 years nor more than life" if those convictions were for the same set of federal offenses listed for those with one prior conviction or "under the laws of any State relating to the sexual exploitation of children." *Id.* In *Mill*, the Fourth Circuit reviewed the 2006 amendment and concluded that:

> There is no reason to assume Congress meant for 'sexual exploitation of children' to be more narrow than the enumerated offenses identified for a person with a single prior conviction enhancement. Congress may have been more concerned with the potential recidivism for people with two prior convictions, and, therefore, created a broader category of convictions that trigger the enhancement. Perhaps Congress simply forgot to alter this part of the statute when it enacted the 2006 amendments, which replaced "sexual exploitation" as the predicate act for a single prior conviction enhancement with the current list of possible convictions. But any arguments along this line are sheer speculation and cannot be used to shed light on the meaning of the statute.

*Mill*, 850 F.3d at 698.[6] Further, the fact that Congress retained the same list of federal predicate offenses while changing only the qualifying state offenses suggests that—if anything, the amendment does not narrow the meaning of "sexual exploitation of children."

The statute itself also supports the interpretation that Congress did not intend to equate the term "sexual exploitation of children" in the recidivist provision with the conduct prohibited in § 2251—all relating to producing visual depictions of sexually explicit conduct. The 2006 amendments were part of the Adam Walsh Child Protection and Safety Act. 120 Stat. 587, § 206. In that same act, in providing for additional prosecutors for offenses relating to the sexual exploitation of children, Congress defined the term "offenses relating to the sexual exploitation of children" to include a list of federal offenses similar to those listed in § 2251(e), including sexual abuse of a minor under Chapter 109A of Title 18 and coercion or enticement of minors under Chapter 117 of Title 18—offenses that go beyond the production of child pornography. *See* 120 Stat. 587, § 704. Thus, we reject the argument that "relating to the sexual exploitation of

---

[6]The Third Circuit has come to a similar conclusion in reaffirming pre-amendment case law, which determined that convictions relating to "the sexual exploitation of children" includes offenses like unlawful sexual contact and statutory rape. *United States v. Pavulak*, 700 F.3d 651, 674 (3d Cir. 2012). The Third Circuit reasoned that the amendment did "not change anything" with respect to its prior case law, because "state laws 'related to the sexual exploitation of children' remained a trigger" for the 35-year-to-life sentencing enhancement. *Id.*

children" includes only offenses that relate to creating visual depictions of sexually explicit conduct.

Under the categorical approach, we "may 'look only to the statutory definitions'—i.e., the elements—of a defendant's prior offenses." *Descamps*, 570 U.S. at 260-61 (quoting *Taylor*, 495 U.S. at 600). Then we compare the elements of that offense to the conduct enumerated in the generic federal offense as it is "commonly understood." *Armes*, 953 F.3d at 879.

Sykes's 1997 statutory-rape conviction required proof that he engaged in the "unlawful sexual penetration of a victim" "at least thirteen (13) but less than fifteen (15) years of age" and that he was "at least four (4) years . . . older than the victim." Tenn Code Ann. § 39-13-506(b). Sykes's 2012 aggravated-statutory-rape conviction required proof that he engaged in the "unlawful sexual penetration of a victim . . . at least thirteen (13) but less than eighteen (18) years of age" and that he was "at least ten (10) years older than the victim." *Id.* § 39-13-506(c). At the time of those offenses, Tennessee defined "sexual penetration" to mean "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7).

The plain meaning of Section § 2251(e) evinces a Congressional intent to define "sexual exploitation of children" to extend to child-sexual-abuse offenses as well as child-pornography-related offenses. And we have held that "[o]f course" statutory rape of a 15-year-old by someone 21 or older constitutes "sexual abuse." *Armes*, 953 F.3d at 879-80. "To state the obvious, 'sexual intercourse' is 'sexual.' And when an adult takes sexual advantage of a child or early teen, that's 'abuse.'" *Id.* at 880. Accordingly, the district court correctly concluded that Sykes's prior Tennessee convictions of statutory rape and aggravated statutory rape mandated a minimum sentence of 35 years.

## B. **Guidelines Enhancements**

Sykes also challenges three Guidelines enhancements: obstruction of justice; unduly influencing a minor; and committing a sexual act with a minor. None of these challenges have merit.

Sykes presents these challenges as support for his argument that his sentence is procedurally unreasonable. Procedural unreasonableness is reviewed for an abuse of discretion. *United States v. Taylor*, 648 F.3d 417, 422 (6th Cir. 2011). "Procedural unreasonableness includes when a sentencing court 'fail[s] to calculate (or improperly calculat[es]) the Guidelines range, treat[s] the Guidelines as mandatory, fail[s] to consider the [18 U.S.C.] § 3553(a) factors, select[s] a sentence based on clearly erroneous facts, or fail[s] to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).

### 1. **Obstruction of Justice**

Sykes first challenges the district court's two-level enhancement for obstruction of justice, which was based on his video meeting with M.D. the night before she testified. Sykes argues that his conduct cannot amount to obstruction of justice because "[h]e never told her what to say, plead the fifth or not show up." Appellant Br. at 54.

During the sentencing hearing, the district court explained that Sykes had "told M.D. that she would not suffer adverse consequences due to her testimony." He informed M.D. that he "had a dream that she did not come to court" and had "'wondered aloud what would happen to M.D. if she invoked her right to silence' and told her in sum that she could say whatever she desired and then went on to give M.D. his attorney's phone number to seek advice regarding her testimony." R.123, PID 1406.

An obstruction-of-justice enhancement applies under U.S.S.G. § 3C1.1 if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of" his offense. *Id.* § 3C1.1. Covered conduct "can vary widely in nature, degree of planning, and seriousness." *Id.* at cmt.

n.3.    The Guidelines commentary explains that "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so" is "covered conduct" under the enhancement, *id.* at cmt. n.4(A), as is "committing, suborning, or attempting to suborn perjury . . . if such perjury pertains to conduct that forms the basis of the offense of conviction," *id.* at n.4(B).

Here, Sykes attempted to have M.D. speak with his attorney so that she could discuss her testimony with him.  The fact that M.D. left a message on counsel's office phone, but that he never returned her call, does not mitigate Sykes's attempt to influence M.D.'s testimony. Appellant Br. at 54, n.3; *cf. United States v. Amerson*, 886 F.3d 568, 579 (6th Cir. 2018) (finding a "substantial step" toward obstruction of justice where the defendant "contacted the person whom he sought to persuade and *directly asked her* to 'claim' his rifle and to 'let them know' it was hers.  By asking her to do so, he did more than describe a potential plan, he enacted it"). And by telling her that he "had a dream" that she did not come to testify or that she could invoke her right to silence, Sykes attempted to encourage M.D. not to testify.  Further, by telling her "in sum that she could say whatever she desired," Sykes attempted to shape M.D.'s testimony.  This effort may have been successful—M.D. was an extremely uncooperative witness and she denied sending messages and photographs until she was confronted with evidence.

Even accepting Sykes's characterization that his conversation with M.D. consisted of a "vague statement about a dream," the Guidelines permit enhancement for "unlawfully influencing a . . . witness . . . directly or indirectly, or attempting to do so," U.S.S.G. § 3C1.1 cmt. n.4(A), and "committing, suborning, or attempting to suborn perjury . . . if such perjury pertains to conduct that forms the basis of the offense of conviction," *id.* at n.4(B).  Here, whether implicitly or explicitly, Sykes attempted to encourage M.D. not to testify or to testify falsely.  Accordingly, the district court did not err in applying a two-level enhancement under the Guidelines.

## 2.  <u>Unduly Influencing a Minor</u>

Sykes next argues that the district court improperly applied a two-level enhancement under U.S.S.G. § 2G1.3 for unduly influencing a minor to engage in prohibited sexual conduct.

Sykes seems to argue that Guidelines commentary instructs that courts should consider "whether a participant's influence over the minor compromised the voluntariness of the minor's behavior." *Id.* § 2G.13, cmt. n.3(B). But he also concedes that the Guidelines provide for a "rebuttable presumption" that the enhancement applies when "a participant is at least ten (10) years older than the minor." *Id.*

Sykes suggests that M.D.'s behavior indicated that she voluntarily engaged in sexual conduct with him. But that is not enough to overcome the presumption. As the government argues, "Facebook and text messages showed Sykes manipulating [M.D.] by claiming he was falling in love with her, showering her with compliments, and promising that he would be with her forever." Appellee Br. at 57 (citing R.124-4, PID 1496, 1499, 1508); *see also United States v. Lay*, 583 F.3d 436, 446 (6th Cir. 2009) (noting that the presumption was not overcome even where the "evidence suggested that [the minor] proposed a meeting with Lay, that [the minor] lied to Lay about being abused, and that [the minor] initiated the original communication with Lay" because "Lay, in pursuit of a sexual liaison, continued to ply a vulnerable and troubled fifteen-year-old with gifts and attention"). The district court did not err in applying a two-level enhancement under the Guidelines for undue influence.

### 3. Sexual Act with a Minor

Sykes's final challenge is that the district court erred by imposing a two-level enhancement under U.S.S.G. § 2G1.3(b)(4)(A) for conduct that "involved the commission of a sex act or sexual contact" with a minor. As with his challenge to the sufficiency of the evidence, Sykes argues that "there is no proof of sexual acts or contacts under any standard of proof. There's talk over a social media platform. Likewise, any photographs are of [M.D.] only and do not show sexual contact." Appellant Br. at 55. But, as discussed at length above, there was ample evidence to support the inference that Sykes and M.D. had sex together. Accordingly, the district court did not err in applying the two-level Guidelines enhancement for the commission of a sexual act.

## VI. Conclusion

For the foregoing reasons, we AFFIRM.