RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0009p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

SHAWN LAMAR PEAKE-WRIGHT, JR.,

*Defendant-Appellant*.

No. 23-1898

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:22-cr-00173-1—Jane M. Beckering, District Judge.

Argued: December 11, 2024

Decided and Filed: January 16, 2025

Before: GILMAN, READLER, and BLOOMEKATZ, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Edward M. Heindel, Cleveland, Ohio, for Appellant. Stephen P. Baker, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Edward M. Heindel, Cleveland, Ohio, for Appellant. Stephen P. Baker, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

───────────────

## OPINION

───────────────

RONALD LEE GILMAN, Circuit Judge. Shawn Lamar Peake-Wright, Jr. moved to suppress evidence that a gun was recovered from one of his jacket pockets during a traffic stop. The district court denied his motion. For the reasons set forth below, we **AFFIRM**.

# I. BACKGROUND

**A.    The stop**

On a bitterly cold night in December 2022, Peake-Wright was riding in the passenger seat of a car driven by his friend Kimberly Manney in Kalamazoo, Michigan.  Sgt. Timothy Millard was patrolling downtown Kalamazoo at the time.  When Manney's car passed him, Sgt. Millard saw the passenger, later identified as Peake-Wright, turn his head away from the officer's line of sight.

Sgt. Millard ran a computer check on the license plate of the car and discovered that the car was registered to Manney, who had a suspended driver's license and an outstanding warrant for her arrest.  This caused Sgt. Millard to pull over the car into a nearby driveway and ask Manney for her driver's license.  Manney informed him that she had only a learner's permit.

At this point, Sgt. Millard recognized Peake-Wright.  He knew from prior encounters that Peake-Wright had an extensive criminal history.  Sgt. Millard took identification from both Peake-Wright and Manney to see if Peake-Wright had a valid driver's license, which would allow Manney to legally drive with her learner's permit.  He then stepped away from the car to run a computer check on Peake-Wright's driver's license and to research Manney's open arrest warrant.

Several minutes later, Officer Timothy Prichard arrived on the scene and knocked on the passenger-side window.  Peake-Wright did not immediately respond, but instead removed his jacket, even though the temperature outside was bitterly cold, the car was no longer running, and the backseat window on the driver's side was rolled down.  He then opened the passenger-side door, explaining that the passenger-side window did not roll down, and stood up outside.  Both officers asked him to sit back down multiple times.  Peake-Wright continued standing, asking: "[W]hat's the problem?", but he eventually got back into the car.  The district court characterized Peake-Wright's behavior at the time as "amped up" and "freak[ed] out."

Peake-Wright stood up again despite the officers' objections, appeared distressed, and asked why more officers had begun to arrive on the scene.  At this point, Officer Prichard handcuffed him and told him that he was being detained (he was not, at this point, under arrest)

for obstructing the traffic stop.  Peake-Wright continued to protest as Officer Prichard put him in the backseat of a police car that was parked in the driveway.

Sgt. Millard then walked down the driveway to Manney, who was now waiting in the street, and asked for permission to search her car.  He told her that he "ha[d] a history with Shawn" and was concerned that Peake-Wright "has something in his jacket that's sitting in the front seat[, t]hat's why he took it off, and I'm worried about what he left in [the] vehicle." Manney declined to give consent.  Sgt. Millard then returned to his car to continue waiting for information about Manney's outstanding arrest warrant.  During the next several minutes, Sgt. Millard received word from the jurisdiction that had issued the warrant that it did not want to book Manney into jail at that time.  Sgt. Millard then informed Manney that she would not be arrested, but that a narcotics dog, which had already arrived on the scene, would sniff around the perimeter of her car.

Around this time, Officer Prichard received information over his radio that Peake-Wright had an outstanding arrest warrant for aggravated assault.  Officer Prichard then placed Peake-Wright under arrest and searched him.

Back at Manney's car, the dog completed its sniff.  It did not give an alert for controlled substances.  When Sgt. Millard learned that the dog did not give an alert, he announced to Manney that he was going to get Peake-Wright's jacket from her car, but that he was "not worried about [Manney's] purse or anything like that."  Sgt. Millard then lifted the jacket and, upon noticing its weight, turned it around.  It was apparent to him that there was a heavy object weighing down one of the pockets.  He reached inside and discovered a loaded 9mm pistol inside a sock.

## B.    Procedural history

A grand jury indicted Peake-Wright for being a felon in possession of a firearm. Peake-Wright moved to suppress evidence of the firearm, arguing that the discovery was the result of an unlawful search and seizure.  The district court held a suppression hearing in April 2023.  Manney, Sgt. Millard, and Officer Prichard testified.  Following argument from the parties, the court delivered an oral opinion.  It held that the automobile exception to an otherwise

unlawful warrantless search applied because Peake-Wright's strange behavior and criminal history gave rise to probable cause to believe that his jacket contained evidence of a crime.

Peake-Wright subsequently entered a conditional plea of guilty, preserving his right to challenge the district court's suppression decision on appeal. This timely appeal followed. Peake-Wright argues on appeal that the police unreasonably prolonged the traffic stop during which the search occurred and that they lacked probable cause to search his jacket.

## II. ANALYSIS

### A. Standard of review

"When a defendant appeals the denial of a motion to suppress evidence, we review the district court's findings of fact under the clear-error standard[,] and we review its conclusions of law de novo." *United States v. Ickes*, 922 F.3d 708, 710 (6th Cir. 2019). Because the court denied Peake-Wright's motion, "we review all evidence in the light most favorable to the government." *United States v. Gunter*, 551 F.3d 472, 479 (6th Cir. 2009); *see also United States v. Huff*, 630 F. App'x 471, 476, 498 (6th Cir. 2015) (applying the clear-error standard to factual findings based on video evidence).

### B. The stop was reasonable in duration

Peake-Wright challenges the legality of not only the search, but also the duration of the stop during which it occurred. We therefore first analyze the reasonableness of the stop. Peake-Wright argues that the stop became unlawful when it "lasted well past any original reason for the stop." We find this argument unpersuasive because Peake-Wright's strange behavior during the stop gave rise to an independent reasonable suspicion that justified prolonging the stop. That reasonable suspicion did not dissipate prior to the search of his jacket.

Peake-Wright does not dispute that the police were justified in initially stopping the car because they had reason to believe that Manney was driving with a suspended license. Rather, he challenges only the duration of the stop. "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S.

348, 354 (2015) (citation omitted). "Because addressing the infraction is the purpose of the stop, [the stop] may last no longer than is necessary to effectuate th[at] purpose." *Id.* (internal quotation marks and citation omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*; *see also United States v. Sharpe*, 470 U.S. 675, 686 (1985) (noting that, in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation").

During a lawful traffic stop, the Fourth Amendment allows "certain unrelated investigations that d[o] not lengthen the roadside detention." *Rodriguez*, 575 U.S. at 354; *see also Arizona v. Johnson*, 555 U.S. 323, 327–28, 333 (2009) (police questioning); *Illinois v. Caballes*, 543 U.S. 405, 406–08 (2005) (dog sniff). But a stop "becomes unlawful if it is prolonged beyond the time reasonably required to complete" its original "mission." *Rodriguez*, 575 U.S. at 350–51 (cleaned up). "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop . . . . But . . . he may not do so in a way that prolongs the stop." *Id.* at 355.

The police may continue a traffic stop "beyond what was reasonably necessary to investigate the original cause for the stop" only if the continued stop is "grounded in independent reasonable suspicion." *United States v. Williams*, 68 F.4th 304, 309 (6th Cir. 2023). That is, the police may prolong a stop based on a reasonable suspicion that arises from unrelated checks conducted during the initial stop. *See id.* at 309–10 (holding that "the district court's opinion properly sanctioned a traffic stop . . . 'fairly responsive to the emerging tableau'" (quoting *United States v. Dion*, 859 F.3d 114, 124–25 (1st Cir. 2017))). "A reasonable suspicion exists when, based on the totality of the circumstances, a police officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011) (quoting *United States v. Baldwin*, 114 F. App'x 675, 679 (6th Cir. 2004)). The totality of the circumstances "includes the officer's own observations as well as information the officer receives from police reports, dispatch, and fellow officers," plus "commonsense judgments and inferences about human behavior" and "inferences the officer may draw based on his experience and specialized training." *United States v. McCallister*, 39 F.4th 368, 374 (6th Cir. 2022) (citations and internal quotation marks omitted).

The stop in the present case was not unreasonably prolonged.  Upon stopping the car, the police "diligently pursued," *see Sharpe*, 470 U.S. at 686, the investigation of Manney's open arrest warrant by radioing for more information.  The officers then conducted lawful "unrelated checks," *see Rodriguez*, 575 U.S. at 355, while awaiting the results of that inquiry, by asking Manney and Peake-Wright questions and by checking for warrants on Peake-Wright.  Peake-Wright does not dispute that the police were diligent in their investigation of Manney's warrant, nor does he argue that any of the actions they took during that investigation improperly prolonged the stop.

The police completed their investigation of Manney's open arrest warrant after approximately 14 minutes.  By this time, the totality of the circumstances—including Peake-Wright's strange behavior and his criminal history—gave the officers the "independent reasonable suspicion," *see Williams*, 68 F.4th at 309, required to continue detaining him.

Peake-Wright does not contest this conclusion.  Rather he argues that any independent reasonable suspicion dissipated upon the drug-sniffing dog's failure to alert to the presence of drugs.  He contends that by the time Sgt. Millard searched his jacket, the stop had transformed into an unlawful seizure, rendering the search unlawful.  True enough, this court has held that "[t]he failure of a drug dog to alert . . . dispels mere reasonable suspicion absent some reason to question the reliability of the drug dog." *Harris v. Klare*, 902 F.3d 630, 637 (6th Cir. 2018).  And there is no evidence in the record here that the officers had any reason to question the reliability of the dog. "The failure of a drug dog to alert," however, "may not always dispel probable cause." *Id.*  For the reasons set forth below, the officers in the present case had probable cause to pursue the search of Peake-Wright's jacket.  The dog's failure to alert did not destroy that probable cause because the factors contributing to that determination did not point specifically to drug possession as opposed to the possession of other types of contraband, such as a weapon.

**C.      The search was lawful under the automobile exception to the warrant requirement**

Having determined that the duration of the stop was lawful, we now turn to the legality of the search, which we analyze under the automobile exception to the warrant requirement.  The owner of a car has a "reduced expectation[] of privacy" in his car due to its "ready mobility."

*California v. Carney*, 471 U.S. 386, 392 (1985). "[T]his diminished expectation of privacy is what justifie[s] the automobile exception to the warrant requirement." *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019). The automobile exception permits officers to search a vehicle without a warrant if they "have probable cause to believe that the vehicle contains evidence of a crime." *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) (citation omitted). "[W]here police have probable cause to believe that a vehicle contains contraband, they may search the entire vehicle and any containers located within it." *United States v. Mans*, 999 F.2d 966, 969 (6th Cir. 1993). Moreover, "the Fourth Amendment does not compel separate treatment for an automobile search that extends only to a container within the vehicle." *California v. Acevedo*, 500 U.S. 565, 576 (1991) (holding that probable cause to believe a paper bag in a car contained marijuana permitted a warrantless search of that paper bag, even though probable cause did not extend to other areas of the car). The police in the present case could therefore lawfully search Peake-Wright's jacket if they had probable cause to believe that it contained contraband.

"Probable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). It consists of "reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion." *Smith*, 510 F.3d at 647–48 (6th Cir. 2007) (quoting *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998)). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Tagg*, 886 F.3d 579, 585 (6th Cir. 2018) (quoting *Wesby*, 583 U.S. at 586).

"The court's determination of whether probable cause existed at the time of the search is a 'commonsense, practical question to be judged from the totality-of-the-circumstances.'" *Smith*, 510 F.3d at 648 (cleaned up). "In determining whether there was probable cause, the court does not look to events that occurred after the search or to the subjective intent of the officers; rather, the court looks at the 'objective facts known to the officers at the time of the search.'" *Id.* at 648 (quoting *Thornburg*, 136 F.3d at 1075).

The district court reasonably concluded that the following factual circumstances gave rise to probable cause to believe that Peake-Wright's jacket contained contraband: the fact that Peake-Wright turned away from Sgt. Millard when the officer first spotted the car; Peake-

Wright's abrupt removal of his jacket, despite the freezing temperature, when Officer Prichard approached the passenger window; Peake-Wright's repeated disobedience of the officers' instructions to remain seated, which ended only when the officers detained him for obstructing the traffic stop; and the officers' familiarity with Peake-Wright's criminal history, which included the unlawful possession of firearms. Video footage in the record further supports the district court's finding that Peake-Wright "freaked out" when the officers approached him. The video shows that he was agitated and argumentative throughout the stop and that he appeared to be trying to distance himself from his jacket.

None of these factors gives rise to probable cause on its own, but each is relevant to the probable-cause inquiry. *See, e.g.*, *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012) (explaining that "evasive behavior and nervousness may be considered as part of the probable cause analysis"); *United States v. Dyer*, 580 F.3d 386, 392 (6th Cir. 2009) (reasoning that although a person's criminal history is "not dispositive," it is "relevant to the probable cause inquiry"). Under the totality of the circumstances, we conclude that the district court did not err in holding that there was probable cause to search Peake-Wright's jacket.

We emphasize that our holding is specific to the facts of this case. Erratic or combative behavior plus a criminal history will not always add up to probable cause for a search. The probable-cause inquiry is based on the totality of the-circumstances, and "there is no specific formula" for probable cause. *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir. 1988). But here we place significant weight on the fact that much of Peake-Wright's unusual behavior revolved around his jacket. That gave the police probable cause to search the jacket, and the jacket alone.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.