NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0032n.06

Case No. 24-1991

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td><td rowspan="2"></td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Plaintiff-Appellee,</td><td>)</td><td>ON APPEAL FROM THE</td></tr>
<tr><td></td><td>)</td><td>UNITED STATES DISTRICT</td></tr>
<tr><td>v.</td><td>)</td><td>COURT FOR THE WESTERN</td></tr>
<tr><td></td><td>)</td><td>DISTRICT OF MICHIGAN</td></tr>
<tr><td>EVERETTE JHAMAL THIBOU,</td><td>)</td><td></td></tr>
<tr><td>Defendant-Appellant.</td><td>)</td><td>O P I N I O N</td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

**FILED**
Jan 16, 2026
KELLY L. STEPHENS, Clerk

Before: GIBBONS, STRANCH, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. Everette Jhamal Thibou pleaded guilty to one count of conspiracy to commit wire fraud for his role in an international elder-fraud scheme. On appeal, he claims that the district court made three mistakes. First, he challenges the denial of his motion to suppress evidence seized during the search of a vehicle in which he was a passenger. Second, he appeals the denial of a motion to suppress his statements that were allegedly taken in violation of *Miranda*. Third, he claims that the district court erred at sentencing by describing victim impact statements. Finding merit in none of these arguments, we **AFFIRM**.

**I.**

**A. Factual Background**

Around 9:00pm on March 7, 2022, Tennessee Highway Patrol Trooper Lance Hughes pointed his radar-clocking unit at a car traveling down I-24 with its headlights on. The radar

registered the car driving 100 miles per hour on a maximum-70-m.p.h. stretch of highway. Because it was dark outside, Hughes was initially unsure which exact car he had clocked. He started following a Honda. Based on the shape of the headlights, Hughes decided that this was not the car he saw speeding. Then, he recognized the headlights on an adjacent Chevrolet Malibu. He told the dispatcher: "Front headlights match on this car." (Mot. Hr'g Tr., R. 295, PageID 1939). So he initiated a traffic stop.

Thibou was a passenger in the car. As Hughes pulled up behind the stopped Malibu, his headlights illuminated its rear window. Hughes saw the front seat passenger putting an object into the back seat. While approaching the driver's side of the Malibu, he smelled marijuana—which Tennessee outlaws for non-medical purposes—emanating from the car.

Hughes asked the driver, M.D., to exit the Malibu and sit in the front passenger seat of his patrol car—a practice he utilizes whenever he stops someone for speeding over 100 m.p.h. He explained that he clocked the Malibu traveling 100 m.p.h. M.D. said she had no explanation as to why she was driving so quickly. While issuing M.D. a ticket, Hughes asked about her travel plans. M.D.'s answers made Hughes suspicious. For instance, she said that she and Thibou flew from Tampa, Florida to St. Louis, Missouri to visit family, but rented a car to drive fourteen hours back. Because such an itinerary could be indicative of criminal activity—and cognizant that I-24 is a known "drug corridor" and that he already smelled marijuana in the vehicle—Hughes asked if there were drugs, "large sums of money over $10,000," or illegal items in the car. (*Id.* at 2141; Gov't Ex. Opposing Mot. to Suppress, R. 207-1, PageID 1010–11). She said no, then denied consent to search the car. Hughes explained that he had probable cause to search the car because it smelled like marijuana. He also asked "[w]hat [Thibou] was . . . stuffing [into the] back seat when I walked up." (Gov't Ex. Opposing Mot. to Suppress, R. 207-1, PageID 1011). During this

discussion, Hughes learned that Thibou and the driver both had felony convictions. Next, Hughes told Thibou to exit the car and asked him about their travels. Thibou gave a conflicting narrative—stating that they stayed at a different hotel, and failing to mention that they were visiting relatives until prompted.

Once additional officers arrived, they searched the car and found marijuana debris and a backpack containing $76,000 in banded cash and men's clothing. At that point, they handcuffed Thibou and seized three cellphones from his person and $6,000 in cash from his pocket.

Hughes read Thibou his *Miranda* rights. At the same time that Hughes asked if Thibou understood his rights, Thibou was pleading to use the restroom. Twice, Hughes told Thibou that there was nowhere to use the restroom on the shoulder of the highway. Hughes asked again if Thibou understood his rights and if he "want[ed] to answer some questions." (Mot. Hr'g Tr., R. 295, PageID 2130; Resp. to Mot. to Suppress, R. 208, PageID 1064). Thibou's responses are inaudible on the bodycam footage. At some point, Thibou said "no." Unsure if Thibou was responding to him, Hughes said, "no?" and "huh?"—then he clarified that "I don't want you to pee on yourself, either, but I need to know whether or not you want to answer some questions I have for you." (Resp. to Mot. to Suppress, R. 208, PageID 1064). Hughes later testified that Thibou responded, "go ahead." (Mot. Hr'g Tr., R. 295, PageID 1909–10).

After that exchange, Thibou answered all of Hughes's questions. Thibou told Hughes that he did not know who the cash from the backpack belonged to. More state troopers met Hughes and Thibou at a nearby gas station. Hughes told them that he had Mirandized Thibou. After those officers questioned Thibou, they decided to seize the cash from the backpack.

State authorities kept the phones while they continued to investigate Thibou. Around April 18, 2022, they submitted a search warrant. The state criminal court initially rejected the warrant

because it was improperly formatted. The judge signed a revised warrant seeking evidence of potential currency smuggling on June 14, 2022. Thibou was not charged with drug-related crimes.

Federal Bureau of Investigations ("FBI") Special Agent Matthew Eagles—who had been investigating a multi-million-dollar elder-fraud scheme since 2021—eventually connected the dots when he found information about Thibou in a fraud victim's cellphone. Eagles learned about the Tennessee traffic stop on July 7, 2022. Four days later, Eagles contacted Tennessee authorities and learned that they still had possession of Thibou's cell phones. After reviewing the traffic stop records, the FBI obtained a warrant to search Thibou's phones in connection with the fraud investigation. A magistrate judge issued the warrant on July 27, 2022. Information extracted from the phones informed the subsequent indictment.

### B. Procedural History

On July 18, 2023, a grand jury charged Thibou and six others with one count of Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. §§ 1349 and 1343. Thibou moved to suppress various items of evidence, including the cash and phones seized from the traffic stop, statements allegedly obtained in violation of *Miranda*, and any evidence derived from those statements. After holding an evidentiary hearing, the district court denied the motions.

Thibou entered a conditional guilty plea in which he reserved the right to appeal the court's denial of his motions to suppress. The district court sentenced him to 168 months' imprisonment and three years of supervised release. It also ordered Thibou to pay over $3 million in restitution.

### II.

When reviewing a motion to suppress evidence, we review factual findings for clear error and legal conclusions de novo, considering the evidence in the light "most favorable to the government." *United States v. Taylor*, 121 F.4th 590, 594 (6th Cir. 2024) (citation omitted). In

doing so, we will affirm "if the district court's conclusion can be justified for any reason." *United States v. Moorehead*, 912 F.3d 963, 966 (6th Cir. 2019) (citation omitted).

## A.  Fourth Amendment Motion to Suppress

Analyzing the events chronologically, as we must, *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020), we conclude that the stop, the extension of the stop, the vehicle search, and seizure of cash and phones all complied with the Fourth Amendment.  And we agree with the district court that the length of the phones' seizure, pending issuance of a warrant, was reasonable.

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV.  A traffic stop is a seizure.  *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012) (citation omitted).  Such stops are deemed reasonable if a law enforcement "officer had probable cause to believe that a traffic violation had occurred or was occurring." *United States v. Watson*, 142 F.4th 872, 878 (6th Cir. 2025) (citation modified).  "Probable cause is not a high bar." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (citation modified).  It requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity."[1] *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983).  So long as there is "probable cause, an officer's subjective intent is irrelevant." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)).

### 1.  *The Stop*

First, Thibou argues that Hughes's initial uncertainty as to which vehicle was speeding shows that he lacked probable cause to stop the Malibu.  We disagree.  Hughes decided to stop the

---

[1] Thibou mistakenly claims that "mere possibility" is not sufficient for probable cause.  (Appellant's Br., ECF 15, 17 (citing *United States v. Ukomadu*, 236 F.3d 333, 337 (6th Cir. 2001)).  *Ukomadu* involved the exigent circumstances exception to the warrant requirement.  That case stated that the "mere possibility" that evidence may be lost does not justify warrantless entry into a home.  236 F.3d at 337.  Its reasoning does not apply here.

Malibu based on two objective indicia: the radar's reading and the matching shape of the headlights. Thibou contends that if Hughes "truly believed" that the headlights on the Malibu were the ones he saw on the speeding car, Hughes would have noticed the Malibu's headlights "as he passed it." (Appellant's Br., ECF 15, 16–17). But the district court found credible Hughes's testimony that he recognized the Malibu by the configuration of its headlights. Under the clearly erroneous standard, we apply great deference to the district court's credibility determination. *See Beaven v. U.S. Dep't of Just.*, 622 F.3d 540, 547 (6th Cir. 2010). And even if Hughes had improperly stopped the Malibu, officers "may make certain reasonable mistakes and still have probable cause." *United States v. Stevenson*, 43 F.4th 641, 645 (6th Cir. 2022) (citing *Heien v. North Carolina*, 574 U.S. 54, 62 (2014)).[2] Accordingly, we agree with the district court that Hughes had probable cause to stop the Malibu.

## 2. *Length of the stop*

Next, Thibou argues that Hughes unreasonably prolonged the stop after issuing the speeding ticket because Hughes lacked reasonable suspicion of any criminal activity. The district court found that Hughes did have reasonable suspicion that criminal activity was afoot, so his decision to extend the stop was constitutional. We agree with the district court.

It is true that an officer may not continue to detain a car and its occupants "unless something happened during the stop to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot." *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005) (citation modified). An officer's authority ends when "tasks tied to the traffic infraction are—or reasonably should have been—completed." *Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020) (quoting

---

[2] As it happens, M.D., the driver of the Malibu, admitted that she was traveling at 100 m.p.h. So Hughes's suspicion that this was the car he had clocked with his radar was borne out within minutes of the stop.

*Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). Reasonable suspicion, however, is an even lower bar than probable cause. It requires less than "a preponderance of the evidence," but more than a "hunch" or "gut feeling." *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *United States v. McCallister*, 39 F.4th 368, 373–74 (6th Cir. 2022) (citations modified). To lawfully prolong the stop, an officer is limited to considering evidence of reasonable suspicion that was apparent at the time of the initial stop. *United States v. Williams*, 68 F.4th 304, 309 (6th Cir. 2023).

Here, several things happened during the stop to raise Hughes's suspicions. On initially approaching the car, Hughes smelled marijuana and observed Thibou put something in the back seat. These facts provided Hughes with at least reasonable suspicion, if not probable cause, to believe that criminal activity was afoot *before* issuing the citation. After that, the information that Hughes learned while completing the tasks necessary to issue the citation—about the travelers' erratic itinerary and felony convictions—only bolstered the likelihood of illegal activity. All of these circumstances, against the backdrop of I-24 being a "drug corridor," permitted Hughes to reasonably prolong the stop.

Both of Hughes's initial observations—smelling marijuana and seeing Thibou's movements as he approached the vehicle—are relevant to the reasonable-suspicion inquiry. Contemporaneous with the stop, Hughes stated what he was seeing and smelling. Specifically, bodycam footage shows that Hughes asked M.D. what Thibou was "stuffing [into the] back seat when [he] walked up" because the "car smell[ed] like weed." (Gov't Ex. Opposing Mot. to Suppress, R. 207-1, PageID at 1011). In similar contexts, we have concluded that smelling marijuana can give an officer more than a reasonable, articulable suspicion; in many circumstances, it can provide probable cause to search a car. *United States v. Brooks*, 987 F.3d 593, 599–600 (6th Cir. 2021) (collecting cases).

The facts of Thibou's search are analogous to those found in *Brooks*. There, we determined that an officer had probable cause to search a car because he smelled marijuana, saw an apparent "marijuana cigar" behind Brooks's ear, and saw Brooks stuffing something under the seat while the officer was approaching the vehicle. *Id.* at 597, 600; *see also United States v. Bah*, 794 F.3d 617, 627 (6th Cir. 2015) (seeing a passenger "fumbling around the passenger's side compartment" gave an officer reasonable suspicion that an individual in the car was armed, affording him the right to ask the individual to exit the vehicle and provide identification, and to conduct a protective sweep of the passenger compartment). True, Thibou's circumstances did not include the presence of a marijuana cigar on his person like in *Brooks*. But in that case, we acknowledged that "the smell of marijuana by itself" will sometimes suffice. *Brooks*, 987 F.3d at 600. Here, based on his training and experience, Hughes recognized the marijuana odor combined with Thibou's actions in turning to stuff an unknown object in the back seat as flags for potential illegal drug activity.

Hughes extended the stop to confirm his suspicions. He obtained more suspicious information "right off the bat" when M.D. told him about her and Thibou's erratic travel plans. (Mot Hr'g Tr., R. 295, PageID 2141). Shortly after that, Thibou gave a conflicting story about their travel. These additional facts are analogous to those presented in *United States v. Smith*, 601 F.3d 530 (6th Cir. 2010). In *Smith*, an officer lawfully extended a traffic stop once he knew that "the car was driving in a known drug corridor," "the car was owned by a third party," the driver "told an implausible [and conflicting] story about her destination," and a passenger's license number was invalid. *Id.* at 542. That the passenger "contradicted [the driver's] story as to their destination" gave the officer "reasonable suspicion to extend the stop further and ask for permission to search the vehicle." *Id.*

Almost all those same facts were present here. The travelers drove a rented vehicle in a known drug corridor, and the driver described unusual travel plans. Combined with his initial observations, Hughes had reasonable suspicion to believe criminal activity was afoot before he questioned Thibou. And just as in *Smith*, the fact that Thibou contradicted the driver's story compounded Hughes's suspicions and gave him reason to "extend the stop further." *Id.*

Resisting this conclusion, Thibou says that the court clearly erred by crediting Hughes's testimony that he smelled marijuana. He also tries to distinguish the smell of burnt and raw marijuana. Neither argument carries the day. As noted earlier, we generally defer to a district court's credibility assessments. *See Beaven*, 622 F.3d at 547. And we will not disrupt the ruling if it is "plausible" based on the evidence presented. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985).

Here, the district court plausibly found that (1) Hughes had experience seizing marijuana; (2) he recognized its smell; and (3) his contemporaneous statements corroborated his testimony. Further, we have previously rejected the existence of any meaningful distinction between raw and burnt marijuana for probable cause purposes. *United States v. Foster*, 376 F.3d 577, 584 (6th Cir. 2004); *United States v. Bohanon*, 420 F. App'x 576, 577 (6th Cir. 2011) (upholding a district court's finding that an officer who smelled marijuana, but gave conflicting testimony about whether it was raw or burnt, had probable cause to search a car). In sum, we conclude that the district court did not err in holding that Hughes's decision to extend the stop complied with the Fourth Amendment.

### 3. *The Search*

Thibou also challenges the search of the Malibu. The district court found that Hughes had probable cause to search the vehicle based on the totality of the circumstances. Thibou has not convinced us otherwise.

Under the "automobile exception," police can search a car without a warrant if they have probable cause to believe that it contains evidence of a crime. *E.g., Watson*, 142 F.4th at 881. An officer who has probable cause to search a car can search every part of "the vehicle and its contents that may conceal the object of the search." *California v. Acevedo*, 500 U.S. 565, 570 (1991) (citation omitted). To determine if probable cause "existed at the time of the search," we evaluate the totality of the circumstances, considering "the objective facts known to the officers at the time of the search." *United States v. Peake-Wright*, 126 F.4th 432, 439 (6th Cir. 2025) (citation modified).

As explained above, Hughes had reason to believe that the car contained evidence of criminal activity: He smelled marijuana, and he saw Thibou moving something from the front to the back seat.[3] Beyond these observations, Hughes—who had conducted "thousands of traffic stops" including "weekly . . . marijuana seizures"—learned additional facts during the stop that pointed to potential criminal activity. (Mot. Hr'g Tr., R. 295, PageID 2122). Thibou and M.D.'s travel plans were highly irregular and, based on Hughes's experience, suggestive of interstate drug trafficking. Moreover, their stories did not match, and both travelers had felony convictions. These facts, considered together, support a finding of probable cause here. *See Brooks*, 987 F.3d at 599–600 (smell of marijuana); *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012)

---

[3] Indeed, Hughes explained this to M.D. while ticketing her: "[Y]our car smells like weed . . . [so] I'm gonna go search through your car. In the state of Tennessee, that's probable cause . . . through the Fourth Amendment . . . automobile exception." (Gov't Ex. Opposing Mot. to Suppress, R. 207-1, PageID 1013).

("inconsistent answers" about "travel plans"); *United States v. Dyer*, 580 F.3d 386, 392 (6th Cir. 2009) (explaining that although criminal history is not dispositive, it is relevant to the probable cause inquiry).

The government also argues that Thibou lacks standing to "contest the search." (Appellee's Br., ECF 23, 29). This may well be true, but our probable cause determination obviates the need to resolve this question. *Cf. Minnesota v. Carter*, 525 U.S. 83, 88 (1998) ("[I]n determining whether a defendant is able to show the violation of his . . . Fourth Amendment rights, the definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." (citation modified)). Since the search was supported by probable cause, it did not violate the Fourth Amendment.

### 4. *Seizure of Items*

Thibou next challenges the seizure of $76,000 in cash from a backpack found in the back seat of the car, three cell phones found on his person, and $6,000 in cash found in his pocket. We find that Hughes had probable cause to seize all these items.

#### i. *Cash*

The district court upheld the cash seizure for two reasons: Thibou did not meet his burden to show that he exhibited a subjective expectation of privacy in the cash, and the seizure was supported by probable cause. We agree on both counts.

If a defendant does not have "a legitimate expectation of privacy" in the item seized, he cannot say after the fact that the officers violated his Fourth Amendment right to be free from unreasonable seizures. *See United States v. Mathis*, 738 F.3d 719, 729–30 (6th Cir. 2013). The defendant bears the burden to show that the seizure violated (1) "an actual (subjective) expectation of privacy" that (2) "society is prepared to recognize as reasonable." *Id.* (citation omitted).

Thibou fails at step one: He denied having any ownership interest in the cash when it was first seized, and after the government-initiated forfeiture proceedings, he never sought return of the cash or the backpack in which the larger sum was found. And in his opening brief on appeal, Thibou does not challenge the district court's rejection of his expectation of privacy in the cash. Only in his reply brief does Thibou argue that the district court clearly erred in finding that he did not have a privacy interest in the backpack containing the cash. But even there, his argument is primarily comprised of a conclusory statement that the district court erred. He points to no facts to support this purported privacy interest. Such "arguments raised for the first time in a reply brief come too late." *Stewart v. IHT Ins. Agency Grp.*, *LLC*, 990 F.3d 455, 457 (6th Cir. 2021). We typically treat them as forfeited. *See United States v. Allen*, 93 F.4th 350, 358 (6th Cir. 2024).

But even considering Thibou's argument that *Rakas v. Illinois*, 439 U.S. 128 (1978), supports his claim of a protectable privacy interest, we remain unpersuaded. For *Rakas* does not state that a defendant who has wholly denied an ownership interest in the item seized can claim an expectation of privacy in it. We have often found the reverse, however. *See, e.g., United States v. Rogers*, 97 F.4th 1038, 1042–43 (6th Cir. 2024) (a passenger who denied that a car was his, "disclaimed his authority over the vehicle," and repeatedly insisted that he "wasn't even driving" did not have a legitimate expectation of privacy in the car, and cannot challenge the vehicle search on Fourth Amendment grounds); *United States v. Tolbert*, 692 F.2d 1041, 1044–45 (6th Cir. 1982) (a defendant who "specifically disclaimed ownership" of a bag lacked a legitimate expectation of privacy in it).

At any rate, the cash seizure was supported by probable cause. The same facts that raised suspicion of the car-occupants' involvement in illegal drug activity supported probable cause to search the backpack and seize the large sums of cash found inside the backpack and on Thibou's

person as potential drug proceeds. And as discussed, once probable cause has been established, officers may search the entire automobile, including items in the vehicle that could be used to hide the objects of the search. *Acevedo*, 500 U.S. at 570. Moreover, at the scene, Thibou did not just disclaim the cash—he also denied knowing where it came from. The district court correctly noted that this oddity added to the already substantial signs of potential criminal activity.

Thibou insists that merely having cash is not a crime, and Hughes "did not have evidence of drug smuggling." (Appellant's Br., ECF 15, 28–29). Both arguments miss the mark. First, we do not view the cash in isolation. *See Peake-Wright*, 126 F.4th at 439. And second, probable cause does not require "an actual showing of [criminal] activity." *Id.* (citation modified). That a subsequent search did not turn up evidence of drug trafficking has no bearing on whether the seizure itself was supported by probable cause. *See United States v. Littleton*, 15 F. App'x 189, 189–90, 193 (6th Cir. 2001).

Hughes had probable cause to seize the money. And for the reasons stated below, it was reasonable to seize the additional $6,000 found in Thibou's pockets, too.

### ii. Cellphones

Next, Thibou challenges the officers' seizure of two cellphones from his hands and one from his pocket. Hughes testified that they did so for two reasons: (1) to preserve evidence, and (2) to prevent Thibou from calling a third party. Another trooper testified that Thibou never asked authorities to return the phones. The district court credited this testimony and found that seizure of the phones pending issuance of a search warrant was reasonable. And again, it noted that Thibou did not meet his burden to show that he had a reasonable expectation of privacy in the phones.

"It is well-settled that police may 'seiz[e] an item based on probable cause in order to secure a search warrant for it.'" *United States v. Sykes*, 65 F.4th 867, 877–78 (6th Cir. 2023)

(quoting *United States v. Respress*, 9 F.3d 483, 486 (6th Cir. 1993)). We have held that a defendant's possessory interest in his phone was minor where he "never requested that his phone be returned." *Id.* at 879. And the government has legitimate interests in preventing destruction of digital evidence. *See id.*

Thibou hardly makes an argument on the privacy front. But even assuming, without deciding, that he maintained a protectable interest in the phones, Thibou has not shown that the seizure of the phones violated the Fourth Amendment. Thibou appears to argue that the seizure was unreasonable because the phones lacked evidence of drug-related activity. This argument puts the cart before the horse. We can only consider facts that the officers knew at the time of the seizure. *Peake-Wright*, 126 F.4th at 439. At that point, law enforcement could not have known what information the phones contained. Considering everything that they did know, as explained above, the officers had probable cause to believe that Thibou was involved in illegal drug trafficking. And among the many other clues pointing to such activity—the smell of marijuana emanating from the car, an item being tossed into the back as the officer approached, an irregular travel plan/pattern, and inconsistent stories between the driver and Thibou regarding travel, all while traveling in a known drug-trafficking corridor—was Thibou's possession of multiple cell phones. We have recognized possession of numerous cell phones as a "tool[] of the drug-trafficking trade." *See United States v. Gilbert*, 952 F.3d 759, 761–62 (6th Cir. 2020); *see also United States v. Taylor*, 471 F. App'x 499, 516 (6th Cir. 2012) (explaining that having multiple cell phones can be a sign of drug dealing).[4] Thus, considering the totality of circumstances, the phones' seizure was supported by probable cause.

---

[4] But contrary to the government's contention, merely owning more than one cell phone is not "in and of itself evidence that [Thibou] was engaged in criminal activity." (Appellee's Br., ECF 23, 48); *United States v. Fletcher*, 978 F.3d 1009, 1016–17 (6th Cir. 2020).

**5.** *Duration of seizure pending warrant*

Thibou alternatively argues that, even if the troopers lawfully seized his phones, the delay in seeking a search warrant was unreasonably long, so the content extracted from the phones should have been suppressed. We reject this argument for two reasons. First, Thibou has not shown that any possessory interest he had in the phones outweighed the government's interest in preserving evidence. Second, the duration of the challenged seizure was not unreasonable.

After lawfully seizing an item, law enforcement must obtain a search warrant within a reasonable amount of time. *Segura v. United States*, 468 U.S. 796, 812 (1984). To decide if the length of a seizure pending issuance of a warrant is reasonable, we weigh the individual's possessory interest in the item seized against law enforcement's interests in retaining it. *Sykes*, 65 F.4th at 877–78. And though Thibou seems to center his argument almost exclusively on the duration of the delay, we consider the totality of the circumstances when evaluating the reasonableness of the extended seizure. Relevant factors include: the suspect's reduced property or possessory interest in the items seized, the nature and extent of the intrusion, the duration of the seizure, and law enforcement officers' diligence in investigating the case while seeking a warrant. *See id.* at 878–79; *Respress*, 9 F.3d at 488; *United States v. Saddler*, 498 F. App'x 524, 530 (6th Cir. 2012).

Thibou faces an uphill battle to show that he had a strong possessory interest in the phones. Never during the time that he now claims was unreasonably long did he ask law enforcement to return the phones. For that reason, the district court correctly noted that any interest he had in the phones was minimal. *See Sykes*, 65 F.4th at 879; *cf. United States v. Johns*, 469 U.S. 478, 487 (1985) (remarking that defendants who "never sought return of the property" that police officers had probable cause to search did not show that a three-day delay "adversely affected legitimate

interests protected by the Fourth Amendment"). While it is true that cellphones occupy a unique place in Fourth Amendment privacy jurisprudence, *see Riley v. California*, 573 U.S. 373, 393–97 (2014), we will not assume a strong *possessory* interest in the cellphones when Thibou's conduct suggested indifference toward the cellphones. *See Sykes*, 65 F.4th at 879 (concluding that the suspect had a "limited possessory interest in [his] [cell]phone").

It follows that the nature and extent of the government's intrusion was reasonable. To be considered unreasonable, the nature or extent of the seizure pending issuance of a warrant would need to "meaningful[ly] interfere[]" with Thibou's possessory interests. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). We have repeatedly upheld seizures of items in which a suspect has minimal possessory interests. *E.g., Saddler*, 498 F. App'x at 531. And Thibou has not articulated why the nature or extent of the intrusion here warrants different treatment.

Compare Thibou's minimal interests with the government's weighty interests in retaining the phones. In *Sykes*, we held that the balance weighed in favor of the government when two things were true: Officers had probable cause to believe that the phone contained digital evidence of potential crimes,[5] and keeping the phones in custody allowed the government to prevent the destruction of digital evidence. 65 F.4th at 879. Those same considerations are present here. First, the troopers had probable cause to seize Thibou's phones because the evidence pointed toward potential interstate drug trafficking and transporting drug proceeds across state lines. Second, Hughes testified that they seized the phones to preserve digital evidence. Both are legitimate interests in maintaining extended custody over the cellphones.

---

[5] Thibou's counterargument—that the delay was unreasonable "[w]hether or not the trooper had probable cause" (Appellant's Br., ECF 15, 32)—thus misstates the law because *Sykes* controls our analysis.

We also conclude that the sixteen-day passage of time between the FBI learning about the phones and obtaining a search warrant was reasonable. During that time, Special Agents acted diligently: They cross-checked state arrest records with an investigatory lead, searched databases to pinpoint Thibou's criminal history, and prepared an affidavit to support the warrant. Attempting to cast the delay as unreasonable, Thibou guides our attention to the 142-day delay between the traffic stop and the issuance of the federal search warrant. It is true that Tennessee authorities did not secure a warrant until months after the traffic stop. Thibou points to no evidence that state or federal authorities failed to diligently investigate while maintaining custody over the phones. Instead, he relies primarily on out-of-circuit caselaw that we have already distinguished. *Sykes*, 65 F.4th at 878–79 (distinguishing *United States v. Pratt*, 915 F.3d 266 (4th Cir. 2019)). In *Pratt*, the Fourth Circuit found a 31-day delay unreasonable when a defendant demonstrated a possessory interest in the phone, law enforcement did not exercise diligence in seeking a search warrant, and the delay was a result of indecision about where to seek a warrant. 915 F.3d at 272. That case does not move the needle for Thibou. It is factually distinguishable, and we have allowed delays of up to 42 days when the balance of interests otherwise favors the government. *Sykes*, 65 F.4th at 878.

None of the actions Thibou described ran afoul of the Fourth Amendment. Accordingly, we affirm the district court's denial of his motion to suppress the cellphone evidence.

### B. Fifth Amendment Motion to Suppress

Next, Thibou attacks the district court's order denying his motion to suppress statements that he claims were taken in violation of his Fifth Amendment right to be free from self-incrimination. We once again review the district court's factual findings for clear error and its

legal conclusions de novo. *United States v. Calvetti*, 836 F.3d 654, 661 (6th Cir. 2016). We affirm the district court's denial.

Law enforcement officers must stop questioning a suspect as soon as he unambiguously invokes his right to remain silent. *Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010); *Miranda v. Arizona*, 384 U.S. 436, 467–73 (1966). If his invocation is ambiguous, "officers may follow up with clarifying questions." *Simpson v. Jackson*, 615 F.3d 421, 430 (6th Cir. 2010), *rev'd on other grounds, Sheets v. Simpson*, 565 U.S. 1232 (2012). Indeed, asking "clarifying questions help[s] protect the rights of the suspect" by ensuring that law enforcement officers honor their requests. *Davis v. United States*, 512 U.S. 452, 461 (1994) (citation modified). When a suspect does not invoke his right to remain silent, he waives it by "making an uncoerced statement to the police." *Berghuis*, 560 U.S. at 388–89.

Thibou asserts that he unambiguously invoked his right to remain silent. The district court found that he did not. After reviewing the video footage of Hughes and Thibou's post-*Miranda* warnings dialogue, the district court found that Thibou's responses to Hughes's questions were largely inaudible on the video. But it accepted as credible Hughes's testimony that Thibou said "go ahead" after Hughes asked whether Thibou wanted to answer some questions. (Mot. Hr'g Tr., R. 295, PageID 2130, 2148). The district court found that nothing on the dashcam video supported Thibou's claim that he "unequivocally invoked his right to remain silent." (*Id.* at 2148).

Thibou merely contests Hughes's version of events. But he has not demonstrated that the district court's factual findings were clearly erroneous. The district court credited Hughes's testimony, so we must accept its finding that Thibou did not unambiguously invoke his right to remain silent. Given this finding, Thibou's subsequent statements were admissible. And the district court correctly denied his motion to suppress them.

**III.**

Finally, Thibou argues that the district court violated his right to due process by relying on victim impact letters that it did not disclose before sentencing. We find that the district court did not commit reversible error.

To satisfy the Fifth Amendment's Due Process Clause, criminal defendants must receive notice and an opportunity to be heard at sentencing. *See United States v. Hayes*, 171 F.3d 389, 392 (6th Cir. 1999). Federal Rule of Criminal Procedure 32(i)(1)(B) protects these rights by requiring that a sentencing court "give to the defendant . . . a written summary of—or summarize in camera—any information excluded from the presentence report . . . on which the court will rely in sentencing, and give them a reasonable opportunity to comment on that information." So unless the district court "disclose[s] sufficient details about the evidence to give the defendant a reasonable opportunity to respond," it must "refrain from relying on the evidence." *United States v. Hamad*, 495 F.3d 241, 243 (6th Cir. 2007). Even modest reliance on undisclosed information may violate Rule 32. *See, e.g., United States v. Patrick*, 988 F.2d 641, 644 (6th Cir. 1993) ("refer[ring] in passing" to undisclosed evidence was improper). A district court need not impose an out-of-Guidelines sentence for us to find that it improperly relied on undisclosed evidence. *Hayes*, 171 F.3d at 392–93.

But when undisclosed evidence encompasses information that the defendant already knows, he necessarily has notice of the information on which the court will rely at sentencing. *Cf. United States v. Meeker*, 411 F.3d 736, 743 (6th Cir. 2005) (upholding a district court's reliance on undisclosed evidence on plain-error review, because undisclosed evidence was cumulative of evidence in the record). Rule 32 only requires the court to disclose information on which it will rely that is *not* contained in the presentence report ("PSR"). *United States v. Robinson*, 503 F.3d

522, 531 n.4 (6th Cir. 2007); *United States v. Moten*, No. 22-3320, 2023 WL 4364005, at *2 (6th Cir. July 6, 2023) ("[A] sentencing court must" apprise the defendant of information "that is not already contained in the PSR").

Here, the district court described six victim impact letters during its discussion of the seriousness of Thibou's offense. The court highlighted the victims' profound emotional suffering, and it stated on the record the amount that most of them had lost. After summarizing the impact letters, the district court concluded that "[t]his was not just theft of money. This was theft of people's spirits and trust and belief in themselves, and they are left broken, ashamed, embarrassed, and untrusting." (Sentencing Tr., R. 367, PageID 2807).

This information was not new to Thibou. The PSR discussed each of these victims— some in greater depth than others. It specifically revealed the victims' emotional suffering in its description of the victims as experiencing embarrassment, anger, loss of sleep, loss of trust, marital problems, financial hardship, medical issues, and adverse mental health effects. The PSR also listed the amount of each victim's financial loss. One of these victim's losses were explicitly mentioned in the indictment. Thibou admitted at sentencing that he received a copy of the PSR and that he had the opportunity to review it with counsel. So he was well apprised of the victims' accounts of the scheme's impact on each of them.

Thibou counters that the PSR only gave him a general sense of the letters' contents. But the information that the district court conveyed did not stray from information contained in the PSR. In this sense, the information from the letters was cumulative. And it is difficult to see how Thibou was denied an opportunity to respond to descriptions of emotional distress when he had notice of the victims' suffering. Moreover, although not dispositive of the issue, Thibou offers us no insight into what he was deprived of raising in response to these letters. As we have previously

observed, there is "little that [a defendant charged with fraud] could have done to effectively rebut the heart-wrenching descriptions of his victims' emotional distress." *Meeker*, 411 F.3d at 742. Regardless, the PSR's inclusion of the information contained in the letters undermines Thibou's profession of ignorance at sentencing.

Moreover, the district court stated that it would have given Thibou the same sentence irrespective of the six letters. (*See* Sentencing Tr., R. 367, PageID 2817–18). The court's reference to the letters during its discussion of the seriousness of the offense does not impugn this statement, considering that the PSR detailed the toll the scheme took on its victims as set forth in the letters. As the district court aptly observed, even without the letters, "[i]t is very clear that 29 people who were defrauded of $3 million in their 70s, 80s and 90s are going to be ashamed, embarrassed, traumatized and financially wrecked by having been deprived of their life savings at that age by a scam." (*Id.*). And unlike the circumstance we considered in *Hamad*, 495 F.3d at 250, Thibou has not suggested that the letters contained confidential facts that only he could address. Instead, the letters were cumulative and essentially irrefutable. As such, they caused no prejudice. So even if there were any error, it would be harmless. *See Meeker*, 411 F.3d at 746.

**IV.**

We **AFFIRM**.